IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JACK YARBROUGH,                          )
                                         )
            Plaintiff,                   )       TC-MD 110322N
                                         )
      v.                                 )
                                         )
MARION COUNTY ASSESSOR,                  )
                                         )
            Defendant.                   )       **DECISION**

Plaintiff appeals the real market value of property identified as Account R28595 (subject

property) for the 2010-11 tax year.  A trial was held on November 7, 2011, in the Tax

Courtroom, Salem, Oregon.  William L. Ghiorso, Attorney at Law, appeared on behalf of

Plaintiff.  Plaintiff testified on his own behalf.  Rick Nasset (Nasset), licensed real estate broker,

also testified on behalf of Plaintiff.  Glen White (White), property tax appraiser, appeared and

testified on behalf of Defendant.  Nasset prepared a broker's price opinion for the subject

property.  However, the broker's price opinion was not timely exchanged under Tax Court Rule-

Magistrate Division 10 C and was not received into evidence.  Defendant's Exhibits A through O

were offered and received without objection.

## I.  STATEMENT OF FACTS

The subject property is comprised of a manufactured home, several other structures

including a "loft barn" a "multi-purpose" building, four "lean-tos," a "pump house," and a

"detached garage," onsite developments and landscaping on a 0.66-acre lot.  (Def's Ex A.)

Nasset testified that the age of the subject property manufactured home is 1998 and it is 1,296

square-feet.  Nasset testified that he inspected the subject property and that he observed a small

deck off the back of the subject property.  White described the subject property fence as "chain

link." (*See* Def's Ex A.) Nasset testified that the subject property gate and fence posts are of a cyclone fence material, but that the actual fence is a "chicken wire mesh." Plaintiff also testified that the subject property fence is chicken wire. Nasset testified that the subject property is in the middle of three parcels that are close together with a "shared driveway." Nasset and Plaintiff both testified that the subject property lot is a "flag lot." White testified that he does not disagree that the subject property shares a driveway with two other properties, but noted that this is common in rural areas. He testified that he does not agree that the subject property lot is a "flag lot."

Plaintiff testified that he purchased the subject property in 2007 with a plan to develop the 20 acres behind the subject property and use the subject property for access. He testified that the only value of the subject property was as access to the 20 acres of land located behind it. Plaintiff testified that he did not buy the subject property for its value as a rental property.

A.    *Plaintiff's value evidence*

Nasset testified that he has been a mortgage broker since 1994 and a licensed real estate broker since 2002. He testified that he completed a broker's price opinion for the subject property and determined values for both the land and the manufactured home. Nasset testified that he collected data from the regional multiple listing service using the parameters of size (0.4 to 1-acre parcels) and age (within 10 years, plus or minus, of the subject property).

1.    *Improvements' value*

Nasset testified that, as of the date of trial, there were 121 "active manufactured homes" "of all sizes and ages" listed in regional multiple listing service. He testified that the regional multiple listing service listings ranged from $4,000 to $114,900 with a median price of $28,900. Nasset testified that, as of the date of trial, there were 188 sales in 2011 (year to date) with sale

prices ranging from $2,000 to $99,900 and a median price of $22,000. He testified that, in 2010, there were 198 sales with a median price of $20,000; in 2009, there were 211 sales with a median price of $23,000; in 2008, there were 223 sales with a median price of $25,000; and in 2007 there were 253 sales with a median price of $25,000. Nasset testified that demand declined "significantly" from 2007 to 2011 based on the number of sales that occurred each year, but median prices did not decline much over that period.

White testified that, for property tax valuation, property is "value in place." He testified that personal property manufactured homes are not "in place" and are not good comparable sales for the subject property because they have to be transported to their eventual location. White testified that there is typically a cost of at least $10,000 to place a manufactured home on land. He testified that Nasset's improvements' value of $25,000 may be the value of a manufactured home if it were to be moved, but that is not the value of the subject property manufactured home, which is situated on land. Nasset testified in response that he researched manufactured homes separate from land because he was not "tasked" to find manufactured homes situated on land.

2. *Land value*

Nasset testified that he determined land values ranging from $53,000 to $58,000, and concluded a land value of $55,000. He testified that he identified three sales and three listings as comparable to the subject property. Nasset testified that the lot sizes of the three sales and listings ranged from 0.41 to 0.88 acres. He testified that his first sale was 0.41 acres that sold for $75,000; it included a large garage, so he made a downward adjustment of $5,000 for an adjusted sale price of $70,000. Nasset testified that his second sale was 0.44 acres in Lebanon, Oregon (Linn County) that sold for $55,000; it did not include a well or septic, but it did include a large

shop, so he made a downward adjustment of $10,000.[1]  He testified that his third sale was 0.73 acres and located north of Mt. Angel; it sold for $65,000 and included a well and septic, so he did not make any adjustments.  Nasset testified that his comparable sales 1-3 occurred on March 28, 2011, December 10, 2010, and March 17, 2011, respectively.  Nasset testified that his sales and listings were "recent" because that is what he was "tasked" to find.  He testified that he did not make any time adjustments because prices have gone both up and down.  Nasset conceded that the "current" listing prices are not reliable indicators of the value of the subject property as of January 1, 2010.

Nasset testified that he considered only rural lots; city residential lots are not comparable to the subject property because they typically have "water and sewer" rather than "well and septic" like the subject property.  He testified that "above-ground sand filter" septic systems are required in the subject property area due to county zoning and environmental overlays.  Nasset testified that three of his six comparable sales and listings included well and septic and three did not.  He testified that, for the three without well and septic, he made an adjustment of $18,000 ($8,000 for the well and $10,000 for septic).  Nasset testified that he did not make size adjustments because, within parameters of 0.4 to 1 acre, there is not much difference in value.  He testified that the subject property is a flag lot and that diminishes its value.

White testified that Nasset's values of $8,000 for the well and $10,000 for septic are a little low, but he does not dispute those values.  He testified the value of onsite developments such as power, telephone, excavation, trenching for utilities, and landscaping must all be included in the land value of the subject property.  Nasset testified in response that he did not

---

[1] Nasset did not state any amount of upward adjustments made for septic or sewer; however, based upon his testimony that an $18,000 adjustment for well & septic is appropriate, it can be concluded that an upward adjustment of $18,000 for those features is required.

"work with" onsite developments, only land and improvements. He testified that he considered the cost of well and septic, but not other onsite developments.

B.     *Defendant's value evidence*

White testified that he looked for comparable sales that would indicate the value of the subject property as a whole. He identified five comparable sales that occurred between March 17, 2009, and April 30, 2010, with prices ranging from $140,000 to $245,000. (Def's Ex D.) White's sale 5 occurred on April 30, 2010, for $140,000; he testified that both the lot and the improvement are smaller than the subject property and the location is inferior. (*See id.*) White testified that sale 5 establishes the low end of the range of values. Sale 1 occurred on March 17, 2009, for $186,000. (*Id.*) White testified that sale 1 is the best comparable sale for the subject property; it is located closest to the subject property and includes a class 2+ house that is older and no longer up to code. (*See id.*) He testified that four of his five comparable sales involve "stick built" homes; only sale 3 involved a manufactured home. White testified that "stick built" homes are the best comparable properties he could find given the parameters of time, location, lot, and size. He testified that sale 3 is the most similar to the subject property in some respects; it is almost identical in size and quality and it is six years older. (*See* Def's Exs D, H-1.) Sale 3 occurred on July 6, 2009, for $159,900. (Def's Exs D, H-2) White testified that the big difference between sale 3 and the subject property are the location and additional acreage. (*See* Def's Exs D, H-1.)

Nasset testified that he would prefer not to compare "stick built" homes to manufactured homes; he would consider larger acreages before comparing the subject property to "stick built" homes. Nasset testified that he agrees that White's sale 1 is very comparable to the subject

/ / /

property with respect to location; it is affected by the same environmental overlays as the subject property. He testified that White's sale 3 involves an inferior lot.

White testified that, based on the Willamette Valley regional multiple listing service "vacant land report," the average price of lots less than one acre in size was $71,452 in December 2009, and $72,037 in January 2010. (*See* Def's Exs K, L.) He also provided a list of seven land sales in Jefferson and Stayton from 2009 and 2010, with an average price of $61,814 and a median price of $53,000. (Def's Ex M.) White testified that the closest land sales to the subject property were a July 24, 2007, sale for $65,500 and a subsequent October 6, 2009, distress sale of a 0.17-acre lot for $55,000. (*See* Def's Exs N, O.) He testified that the subject property land value of $77,800 is supported by his market research. (*See* Def's Ex A.)

White testified that the value of the subject property onsite developments was reduced at the board of property tax appeals (BOPTA) from $34,000 to $25,990. (*See id.*) White testified that the subject property landscaping at the time of the 2007 listing included apple trees, shrubs, a lawn, and a "fish pond." (*See* Def's Ex E.) He determined a value of $4,000 for the subject property "yard improvements," including "over 300 [square-feet] of deck [with] railing, over 200 [feet] of 3.5 [foot] chain link fence, [and a] concrete sidewalk." (Def's Ex A.) Plaintiff testified that he disagreed with White's value conclusions for the subject property onsite developments and landscaping. He testified that the subject property includes an "outdated sewer system" with a 250 gallon tank. Plaintiff testified that the subject property deck needs to be repaired; the fence is not "chain link," but rather "chicken wire"; the "concrete sidewalk" is about 50 years old and "cracked"; and the apple trees are 50 to 60 years old and rotten.

White determined that several of the subject property improvements have no value, including a "loft barn," a "multi-purpose" building, three "lean-tos," a "pump house," and a

"detached garage." (Def's Ex A.) Plaintiff testified that those improvements actually have a "negative value" because of the costs associated with demolition. He testified that demolition will cost $25,000 to $33,000, including the cost of hauling away materials. White testified that he disagrees with Plaintiff's estimate of demolition costs, noting that Plaintiff could burn the derelict buildings himself. Plaintiff testified that he disagrees that he can demolish any structures by burning them; the Marion County Fire Department would not allow that.

The 2010-11 roll real market value determined by Defendant was $176,750. (Ptf's Compl at 2.) BOPTA reduced the 2010-11 real market value to $168,750, with the reduction entirely in the land real market value. (*Id.*) BOPTA reduced the 2010-11 exception value from $176,750 to $168,750 and reduced the 2010-11 maximum assessed value from $112,710 to $107,610. (*Id.*) Plaintiff requests that the 2010-11 real market value be reduced to $75,000, with $40,000 allocated to the land and $35,000 to the improvements. (*Id.* at 1.) Defendant requests that the 2010-11 real market value be reduced from $168,740 to $149,320. (Def's Ex A.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor (Richardson)*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345

///

///

///

///

///

(1995)).  Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash
> that could reasonably be expected to be paid by an informed buyer to an informed
> seller, each acting without compulsion in an arm's length transaction occurring as
> of the assessment date for the tax year."[2]

The assessment date for the 2010-11 tax year was January 1, 2010.  ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]"  ORS 308.205(2).  There are three methods of valuation that are used to determine real market value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach.  *Allen v. Dept of Rev.*, 17 OTR 248, 252 (2003).  All three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property.  OAR 150-308.205-(A)(2)(a).  The approach of valuation to be used is a question of fact to be determined on the record.  *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533 (1979).  Both parties considered the sales comparison approach to be applicable.  OAR 150-308.205-(A)(2)(c) states, in pertinent part:

> "In utilizing the sales comparison approach only actual market transactions of
> property comparable to the subject, or adjusted to be comparable, will be used.
> All transactions utilized in the sales comparison approach must be verified to
> ensure they reflect arms-length market transactions."

"The court looks for arm's-length sale transactions of property similar in size, quality, age and location * * * in order to determine the [real market value]" of the subject property.  *Richardson*, WL 21263620 at *3.

Plaintiff has the burden of proof and must establish his case by a preponderance of the evidence.  ORS 305.427.  A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence."  *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

---

[2] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

"[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.* (*Poddar*), 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Nasset testified on behalf of Plaintiff that he determined the value of the subject property land and improvements separately. To value the subject property improvements, he identified the median price of sales of manufactured homes in 2007, 2008, 2009, 2010, and 2011 year to date, as of the date of trial. From that information, Nasset concluded a value of $25,000 for the subject property improvements. The collection of raw data from the regional multiple listing service over several years is not one of the recognized approaches of valuation under OAR 150-308.205-(A)(2)(a). Furthermore, that information is not helpful in determining the value of the subject property improvements because there is no way to determine which, if any, of the sales included in Nasset's data are comparable to the subject property. As noted by White, Nasset's data also fails to account for the value of the subject property improvements "in place" on the land.

Nasset testified that he determined land values ranging from $53,000 to $58,000, and concluded a land value of $55,000 for the subject property land. He testified that he identified three land sales and three listings. Nasset testified that his land sales occurred in December 2010 and March 2011, but he did not make any adjustments for time. Based on Nasset's testimony, the land sales appear to be comparable to the subject property land with respect to lot size.

DECISION  TC-MD 110322N                                                                      9

Nasset's "adjusted" sale prices for his three land sales were $63,000,[3] $65,000, and $70,000. He testified that he did not consider the value of onsite developments, other than well and septic or landscaping. It is not clear to the court how Nasset determined land values ranging from $53,000 to $58,000; those values conflict with the three land sales about which Nasset specifically testified. Furthermore, Nasset's land value evidence does not support Plaintiff's requested land value of $40,000; it is more supportive of Defendant's land value.

Based on his inspection of the subject property and the comparable sales that he identified, White determined a 2010-11 real market value of $149,320 for the subject property. Plaintiff criticized White's value conclusion based on the comparability of White's sales (four of White's five comparable sales were "stick built" homes rather than manufactured homes) and based on the value that White attributed to onsite developments and the "yard improvements." As stated in *Poddar*, "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." 18 OTR at 332. Plaintiff expressed his opinion concerning the poor condition of the onsite developments and the "yard improvements," but failed to offer any competent evidence concerning their value.

The court finds that Plaintiff failed to prove by a preponderance of the evidence that the 2010-11 real market value of the subject property was $75,000. Defendant presented persuasive evidence in support of a 2010-11 real market value of $149,320. For the court to order a change in real market value to the tax roll, Plaintiff must be aggrieved. ORS 305.275(1)(a). To be aggrieved, the ordered change to the tax roll must result in a property tax reduction. The

---

[3] Nasset testified that his second land sale price was $55,000 and he made a downward adjustment of $10,000 because it included a large shop. He also testified that land sale 2 did not include well or septic. Based on Nasset's testimony that an adjustment of $18,000 is necessary for land that lacks well and septic, the court determined an adjusted sale price of $63,000 for Nasset's land sale 2.

2010-11 maximum assessed value of the subject property is $107,610,[4] and the court did not receive evidence as to whether a reduction in the 2010-11 real market value to $149,320 would result in tax savings to Plaintiff.

### III. CONCLUSION

After careful consideration of the testimony and evidence presented, the court finds that the 2010-11 real market value of the subject property was $149,320.  Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account R28595 was $149,320 for the 2010-11 tax year.  The tax roll will be adjusted only if Plaintiff is aggrieved.

Dated this ___ day of January 2012.

ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on January 26, 2012.  The Court filed and entered this document on January 26, 2012.*

---

[4] Plaintiff did not appeal the 2010-11 exception value or 2010-11 maximum assessed value.